IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,          )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )     No.  05-20128
                                   )
DEBORAH McGINNIS,                  )
                                   )
        Defendant.                 )

ORDER ON DEFENDANT'S MOTION TO SUPPRESS

        This cause is before the Court on the motion of defendant,
Deborah McGinnis, through appointed counsel, Bruce I. Griffey, to
suppress any evidence obtained in this case against Ms. McGinnis
as a result of her detention and the search of her baggage at
Memphis International Airport on April 2, 2005.  Defendant
asserts that she had completed her entry into the United States
and was entitled to the full protection of the Fourth Amendment.
Defendant asserts that the additional search of her luggage and
person after she had completed the entry process was conducted
without probable cause or reasonable suspicion that Ms. McGinnis
had engaged in any unlawful activity.

        The United States, in responding to Defendant's argument
under the Fourth Amendment, relies on the right of sovereign
nations to protect themselves by stopping and examining persons

and property crossing the border.  <u>United States v. Flores-
Montano</u>, 571 U.S. 149, 153 (2004); <u>United States v. Ramsey</u>, 431
U.S. 606, 616 (1977).  This "border search" exception to the
Fourth Amendment, the government contends, has been extended to
searches of individuals near the border or its functional
equivalent.  <u>See</u> <u>United States v. Wang</u>, 286 F.3d 940, 945 (7th
Cir. 2002); <u>United States v. Wardlaw</u>, 576 F.2d 932, 935 (1st Cir.
1978) (where suspect has not left the sight of the border, a
subsequent inspection is still a reasonable border search).  The
United States concedes that the Sixth Circuit has not examined
the extended border search doctrine.  The United States also
asserts that, because the immigration officers in this case had
reasonable suspicion of criminal activity, this is an appropriate
case for the application of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  In
that regard, the United States contends that there was reasonable
suspicion of criminal activity based on specific and articulable
facts.


                          THE FACTS


     Four officers testified in a two-day hearing in this case.
They were:  (1) Brian Hooper, an officer with U.S. Customs and
Border Protection at the Memphis International Airport since
October, 2002; (2) Raymond Shawn Polley, an officer with U.S.

                              2

Customs and Border Protection at the Memphis International Airport for 13½ years; (3) Todd Key, an officer with U.S. Customs and Border Protection since September, 2002; and (4) Blaine Crum, a special agent with the Department of Homeland Security, Immigration and Customs Enforcement since November, 1991.

**BLAINE CRUM**
**SPECIAL AGENT**

Special Agent Crum testified that Immigration, Customs and Enforcement agents respond to matters which are brought to their attention by Customs and Border Protection officers, including the three officers at the Memphis International Airport.  On April 2, 2005, Special Agent Crum received a telephone call from Officer Brandon Marler at the airport, advising her that two individuals had arrived in Memphis aboard the Amsterdam Northwest 57 flight.  Vol. 2 Tr. at 95.  Those two individuals were identified as a Mr. Ely and a Ms. McGinnis.  At the time of the phone call, Officer Crum was advised that Ms. McGinnis had been processed "and was being released, and that Mr. Ely was being detained based on a discrepancy in the amount of money that he was carrying."  Vol. 2 Tr. at 96.  Special Agent Crum proceeded to the airport in connection with the investigation.

3

When Special Agent Crum arrived, Mr. Ely was still at the
Federal Inspection Station (FIS).  According to Special Agent
Crum, Mr. Ely had declared in his customs declaration that he was
carrying "between six and seven thousand dollars and advised the
inspectors of that.  Further search of his luggage revealed that
he was carrying over $13,000."  Vol. 2 Tr. at 96.  According to
Special Agent Crum, she then spoke to Mr. Ely and "he made a
statement to me basically that he had grabbed a quantity of money
out of the safe and he didn't know how much money he had grabbed.
. . ."[1]  Vol. 2 Tr. at 96.  Special Agent Crum then contacted the
Assistant United States Attorney, Fred Godwin, and requested
authorization to arrest Mr. Ely for bulk cash smuggling.  Vol. 2
Tr. at 97.  Mr. Ely identified his traveling companion as Deborah
McGinnis.  At that point, Special Agent Crum had not spoken to
Ms. McGinnis.  Special Agent Crum advised Mr. Ely that he was
being arrested for the offense of bulk cash smuggling and
discussed with Mr. Ely "the disposition of his luggage."  Vol. 2
Tr. at 97.

---

[1]Ely and McGinnis had been working as contract employees for the
Department of Defense in Iraq.  They were returning to the U.S.
and had with them money from a bank/safe in Kuwait.  See Vol. 1
Tr. at 15, 57, Vol. 2 at 82, 96, 99.

According to Special Agent Crum, Mr. Ely "agreed that he would like to give his luggage to Ms. McGinnis." Vol. 2 Tr. at 97. Special Agent Crum testified that Officer Polley then located Ms. McGinnis at the front of Memphis International Airport and a vehicle was dispatched "to go over there and pick her up." Vol. 2 Tr. at 97. Customs officers were also instructed to re-inspect Mr. Ely's luggage before turning it over to Ms. McGinnis. During that re-inspection, an additional $11,000 in cash ($11,000 in addition to the initial $13,000 found) was found in the re-inspection of Mr. Ely's luggage and his person.[2] Thus, a total of $24,088, including foreign and U.S. currencies, were recovered from Mr. Ely. Vol. 2 Tr. at 98-99.

Special Agent Crum testified that Ms. McGinnis was returned to the customs area during the re-inspection of Mr. Ely's luggage. Vol. 2 Tr. at 99. Specifically, Special Agent Crum testified:

> Yes, she had come in. We had given her a seat over in the first lane of the secondary area. She appeared nervous, she was sweating, she was fidgety, red-faced,

---

[2]During the re-inspection of his luggage, Mr. Ely volunteered that he had an additional $2,500 in his back pocket. Vol. 2 Tr. at 98-99.

5

flushed.  I had a brief conversation with Ms.
McGinnis at the time, and she stated to me
that -- she also stated that she knew Mr. Ely
had grabbed a quantity of money out of the
safe and didn't know how much he had
obtained.

Vol. 2 Tr. at 99, lines 4-10.  Based on this, Special Agent Crum

stated "it raised my suspicion as to she might possibly have

money also."  Vol. 2 Tr. at 99.


     Special Agent Crum further testified that Officer Key

"arrived with Ms. McGinnis" and "Officer Key advised me about the

statement Ms. McGinnis made about she was worried about her money

being taxed.  The officer mentioned the fact that she had stated

that she was going to be staying in Memphis for two days with her

boyfriend, Mr. Ely."  Vol. 2 Tr. at 100.  During this period of

time, Special Agent Crum testified that Ms. McGinnis' luggage was

still in the van that had been used to transport her from the

front of the airport to the FIS.  According to Special Agent

Crum, she "got with Inspector Polley, and I advised him that a

search of her bags [McGinnis' bags] needed to be conducted and I

told them to retrieve Ms. McGinnis' luggage out of the van."

Vol. 2 Tr. at 100.[3]  Ms. McGinnis was returned by Officer Polley

---

[3]Special Agent Crum described in some detail the process by
which she determined the distance from the federal inspection
station (the location to which Ms. McGinnis had been returned)
and the Northwest ticket area in B concourse, where Ms. McGinnis
had been picked up by the officers.  Vol. 2 Tr. at 101-102.

to the FIS at approximately 6:00 p.m.[4] on April 2, 2005.  Her

baggage was returned from the van to the federal inspection

station and searched at approximately 6:15 or 6:20 p.m. on

April 2.  Vol. 2 Tr. at 103.[5]  On cross-examination, Special

Agent Crum confirmed that she "never asked Ms. McGinnis for

permission to search her luggage . . . ."  Vol. 2 Tr. at 106.


### TODD KEY
### U.S. CUSTOMS AND BORDER PROTECTION OFFICER


On April 2, 2005, Officer Key had been working the second

primary position in the FIS.  His duty had been to look at the

customs declaration of individuals coming into the country.  When

he completed those duties, he was assigned by supervising Officer

Polley "to go to the front of the airport and pick up Deborah

McGinnis."  Vol. 2 Tr. at 79.  Supervisor Polley told Officer Key

---

Architectural measurements indicated that Ms. McGinnis was
approximately three-tenths of a mile (that is, 1,582 feet) away
from the Federal Inspection Station (FIS) when she was picked up
by Officer Polley to be returned to the FIS.  Vol. 2 Tr. at 101.

[4]McGinnis, after initially clearing customs, had waited for
perhaps as much as 30 minutes in the FIS area for Mr. Ely.  By
4:30 p.m. on April 12, 2006, she had left the area, ultimately
leaving the secured area of the airport and waiting for Mr. Ely
approximately .3 miles from the FSI in the general public area at
the front of the terminal.

[5]Special Agent Crum made it clear that, once Ms. McGinnis was
returned to the federal inspection station by Officer Polley, she
was told that she would not be allowed to amend her declaration.
Vol. 2 Tr. at 103.

that he could expect to find Ms. McGinnis "in front of the
airport by the Northwest area."  Vol. 2 Tr. at 80.  When Officer
Key picked up Ms. McGinnis to return her to the Federal
Inspection Station, he told her that his purpose for picking her
up was to "have her come back and pick up Mr. Ely's bag."  Vol. 2
Tr. at 81.  Because her luggage could not be left unattended in
the airport, it was necessary that she return with her bags to
the FIS.  Vol. 2 Tr. at 82.  Once Officer Key and Ms. McGinnis
arrived at the FIS, Officer Key "explained the currency reporting
requirements to her . . . [and] advised that it's okay to carry
any amount of currency in and out of the United States.  If it is
over $10,000, we would have to fill out a CMIR, and she advised
that she thought she would be taxed on the money."  Vol. 2 Tr. at
83.

     Officer Key testified that Ms. McGinnis was given a place to
sit in the FIS upon their return and that the re-inspection of
Mr. Ely's baggage was proceeding in Ms. McGinnis' presence.  Vol.
2 Tr. at 84.  The money that was being recovered from Mr. Ely's
baggage was "in plain sight" and Ms. McGinnis "appeared to be
nervous.  She was looking around a lot. . . ."  Vol. 2 Tr. at 84.
Supervising Officer Polley then directed that Ms. McGinnis'
luggage be brought back inside the federal inspection station and
searched again.  Vol. 2 Tr. at 85.  At that point, Officer Key

asked Ms. McGinnis if everything in the baggage was hers, to which she responded "yes".  Vol. 2 Tr. at 85, line 20.  Officer Key testified that he again asked Ms. McGinnis the question regarding how much money she was carrying and she advised that she wanted to amend her declaration to indicate that she was carrying $12,000 "to be on the safe side."  Vol. 2 Tr. at 86.[6] Officer Key inquired as to whether she had acquired any money while she was "upstairs" to which she indicated, according to Officer Key, "no, she had closed out a bank account in Kuwait before she came."  Vol. 2 Tr. at 86.  The search of McGinnis' luggage resulted in finding $16,396 in U.S. currency and $967 in Kuwaiti currency.  Vol. 2 Tr. at 87.

**RAYMOND SHAWN POLLEY**
**SUPERVISORY CUSTOMS AND BORDER PROTECTION OFFICER**

Officer Raymond Shawn Polley is a supervisory Customs and Border Protection ("CPB") officer.  He oversees the operation of CBP officers at the Memphis International Airport.  Vol. 1 Tr. at 36.  He was working at the Memphis International Airport on April 2, 2005 in connection with the inbound Northwest flight from Amsterdam.

---

[6] But see Vol. 2 Tr. at 103 (Crum stated that McGinnis would not be allowed to amend her declaration).

Customs and Border Protection Officer Marlier called Officer Polley's attention to an incoming passenger, Mr. Ely, and indicated "that Mr. Ely had been asked to declare the amount of currency he was carrying, and his declaration was less than $10,000 and that subsequent to his secondary examination, he was found to be carrying more than $10,000." Vol. 1 Tr. at 36-37.

Officer Polley testified that, upon making the determination regarding cash in excess of $10,000 being carried by Mr. Ely, it was his job (Polley's job) "to look at the circumstances and determine whether or not protocol had been followed in getting the proper declaration, and if that were the case, then we would initiate seizure proceedings on the money, and then we would also notify our investigative branch, the Immigration and Customs Enforcement officers . . . ." Vol. 1 Tr. at 37. It was at this point that Special Agent Crum was contacted and came to the airport. Special Agent Crum made the decision to arrest Mr. Ely. Vol. 1 Tr. at 38. Officer Polley confirmed that, at that point, Mr. Ely was given two options in connection with his luggage and that he (Mr. Ely) indicated "that he would prefer that his traveling companion, if she would agree, to take possession of his luggage for him." Vol. 1 Tr. at 39. Officer Polley then had Ms. McGinnis paged and, when she responded, communicated with her

10

by phone "to indicate to her that he [Ely] was going to be arrested and he was requesting that she retrieve his luggage for him." Vol. 1 Tr. at 40.  Ms. McGinnis "indicated that she would take his luggage, but there was an issue of getting her back to the FIS to get the luggage." Vol. 1 Tr. at 40.  According to Officer Polley, Ms. McGinnis was "at the front of the airport out near the ticketing counter . . ." Id.  The problem in returning Ms. McGinnis to the FIS was that "TSA Security would not allow her to bring her checked baggage back through the security checkpoint into the sterile area of the airport, so I indicated to her that that really wouldn't be a problem, that I could send two of our officers in a vehicle to the front of the airport to retrieve her and her luggage and bring her back to retain his luggage." Vol. 1 Tr. at 40-41.  Officer Polley dispatched Officers Waters and Key in a vehicle to retrieve Ms. McGinnis. Id.[7]  Ms. McGinnis was returned to the FIS at approximately 6:00 p.m.  Id.

Officer Polley testified that after Ms. McGinnis' return to the FIS she was interrogated as to whether she had acquired any additional funds since leaving the FIS, and whether she had exchanged any money.  To both of these inquiries, she indicated

---

[7]They received a description which indicated that "she has blondish hair" and had on a "blue sleeveless top."  Vol. 1 Tr. at 41.

"no."  Vol. 1 Tr. at 43.  Officer Polley also testified that "she seemed very nervous . . . she was fidgety, her face was somewhat flushed.  She seemed to be perspiring a little bit."  Vol. 1 Tr. at 43.  He also stated that Ms. McGinnis was allowed to amend her declaration, which initially indicated that she had $3,000 and, upon her return to the FIS, was amended to reflect $5,000, and then amended to reflect $12,000.[8]  Special Agent Polley was present when Ms. McGinnis' luggage was searched after her return to the FIS, at which time currency in excess of $17,000 was located.  Id.

On cross-examination, Officer Polley confirmed that his office had received a text message/alert as to two individuals - Ms. McGinnis and Mr. Ely.  The source of that message was an IRS representative.  Vol. 1 Tr. at 46.  Therefore, before Mr. Ely and Ms. McGinnis deplaned, Customs and Border Protection had been alerted and was waiting for them with the intention of doing additional or further inspection upon their arrival.  Vol. 1 Tr. at 47.  Based on that information, both Mr. Ely and Ms. McGinnis were referred to a secondary inspection station upon their arrival in Memphis, Tennessee.  Officer Polley arrived at the FIS

---

[8]But see statement of Special Agent Crum.  Vol. 2 Tr. at 103. See Note 5 supra.  It appears that any discussion with Ms. McGinnis began after the search of her luggage had commenced. See Vol. 1 Tr. at 53.

after the initial search of Mr. Ely's luggage which had resulted in the detection of cash in excess of $10,000.  Vol. 2 Tr. at 47-48.  Officer Polley recalled that, after Ms. McGinnis had completed inspection at the secondary station, she remained in the area "waiting for her traveling companion to be processed." Vol. 1 Tr. at 48.  At that point, Officer Polley knew that Mr. Ely and Ms. McGinnis were traveling companions.  Id.[9]  Officer Polley also confirmed that the interrogation of Ms. McGinnis concerning whether or not she had acquired any additional cash or exchanged any currency was "after her luggage had been returned [to the FIS] and . . . just prior to or during the initial phase of the reexamination of her luggage" at the direction of Special Agent Crum.  Vol. 1 Tr. at 53.  Additionally, Officer Polley confirmed that he and Officer Crum made "the decision to reexamine [Ms. McGinnis' luggage] . . . prior to Ms. McGinnis being reasked to amend her declaration", (Vol. 1 Tr. at 56) that is, prior to Ms. McGinnis' request that she be allowed to amend

---

[9]At the time Ms. McGinnis left the FIS, Officer Polley knew (1) that Mr. Ely and Ms. McGinnis were traveling companions; (2) that cash had been found in Mr. Ely's luggage in excess of $10,000; (3) that there was a problem with Mr. Ely's declaration (i.e., it was materially false); and (4) that he had received a text message from an IRS representative identifying Ms. McGinnis and Mr. Ely for special attention.  Vol. 1 Tr. at 51.  In spite of this information, no additional search or inspection of Ms. McGinnis' baggage was conducted and Ms. McGinnis was released from the FIS, was no longer under any surveillance, and was free to leave the airport.  Id.  Vol. 1 Tr. at 51-52.  Moreover, more than one hour elapsed before there was any further contact with Ms. McGinnis.

her declaration to reflect larger sums of money.  Vol. 1 Tr. at 54-56.[10]  Finally, Officer Polley confirmed that the only additional information he had at the time of the decision to reinspect Ms. McGinnis' luggage upon her being brought back to the FIS, was "that Mr. Ely had additional currency secreted in his luggage in a particular way."[11]  Vol. 1 Tr. at 57.  Officer

---

[10]Officer Polley testified as follows:

>    Q.  At what point are you talking about her changing her story?  Is this when she was brought back to the FIS or was this prior to her leaving the FIS the first time?

>    A.  After she returned to the FIS, Officer Key asked her if she wanted to amend her declaration.

>    Q.  And she was asked about amending her declaration after her luggage had been brought in from the van and was in the process of being searched, correct?

>    A.  After it had been brought in.  I can't be exactly certain as to whether Officer Key had opened the bags and begun the examination or if he was just preparing to reexamine the bags.

Vol. 1 Tr. at 55, lines 6-17.

It appears clear from the testimony that the request by Ms. McGinnis to amend her declaration were not, in fact, a basis for reasonable suspicion or probable cause for either Inspector Crum or Officer Polley since the search of Ms. McGinnis' bags was commenced prior to those statements by Ms. McGinnis.  See Vol. 1.

[11]In context, this could not have been particularly significant new information, because Officer Polley knew while Ms. McGinnis was still in FIS the first time that Mr. Ely had undeclared cash in excess of $10,000.

14

Polley confirmed that Ms. McGinnis was not asked permission to reinspect her luggage and that she did not have a choice in that regard.  Vol. 1 Tr. at 57-58.

OPERATIVE FACTS

The officers in this case have related the events as each of them recalls them concerning the initial inspection, release, paging, and return of Ms. McGinnis to the FIS on April 2, 2005. It is undisputed that a number of facts were known to the customs officers in the FIS prior to and at the time of the arrival of Ms. McGinnis at Memphis International Airport.  These factors resulted in Ms. McGinnis being sent to a secondary station and being the subject of an inquiry at that time.

Despite all of this information[12], at some time between 4:00 and 4:30 p.m. on April 2, 2005, she was released from the FIS and was free to leave the airport.  She waited for an undefined period of time for her traveling companion, Mr. Ely, and then left the FIS and proceeded outside the sterile area into the public portions of the airport, approximately three-tenths of a mile from the FIS.

---

[12]See, e.g. page 12 supra.

15

She was subsequently paged sometime after 5:30 p.m. on April 2, 2005 and responded to that page.  Supervising Officer Polley and Special Agent Crum made the decision to reinspect Ms. McGinnis' luggage before she was returned to the FIS by Officer Key.  Upon return to the FIS, Ms. McGinnis was no longer free to leave.  Within 10 to 15 minutes of her return, reinspection of Ms. McGinnis' luggage began and she was asked additional questions by Officer Key about her luggage and her customs declaration.  These questions were biographical in nature and were not for the purpose of allowing her to amend her declaration.[13]  Undeclared cash in excess of $10,000 was recovered from Ms. McGinnis' luggage.

---

[13]It is undisputed that no <u>Miranda</u> warning was given.  <u>Miranda</u> protection extends to persons who, while in custody, are interrogated by persons the suspect knows to be acting on behalf of the state.  Some types of questioning are not considered interrogation and do not require <u>Miranda</u> warnings.  For example, routine border questioning does not constitute interrogation for purposes of the Fifth Amendment and does not require <u>Miranda</u> warning.  <u>See</u> <u>United States v. Ozuna</u>, 170 F.3d 654 (6th Cir. 1999) (questions of individual coming into the United States about that individual's identity and national origin are biographical in nature and do not constitute interrogation). Therefore, questions that are solely for the purpose of determining admissibility to the United States constitute routine border questioning and require no <u>Miranda</u> warning.  However, questions that are designed to elicit incriminating responses may constitute interrogation for purposes of Fourth Amendment analysis.  <u>See</u> <u>United States v. Gonzalez-Sandoval</u>, 894 F.2d 1043 (9th Cir. 1990).  Additionally, "psychological ploys" designed to elicit incriminating responses may also constitute interrogation for Fourth Amendment purposes.  <u>See</u> <u>Nelson v. Fulcomer</u>, 911 F.2d 928, 938-39 (3rd Cir. 1990).

16

ANALYSIS

Searches of individuals as they enter or leave the United States are allowed as "border searches" and do not require a warrant.  See United States v. Montoya De Hernandez, 473 U.S. 531 (1985).  Under the border search exception to the warrant requirement of the Fourth Amendment, routine border stops and searches of persons, luggage, and personal effects may be conducted without probable cause or even reasonable articulable suspicion.  Id.  See Brent v. Ashley, 247 F.3d 1294 (11th Cir. 2001) (custom officials allowed to conduct initial stop of airline passenger).  The search of Ms. McGinnis' luggage in the instant case, had it occurred at her initial stop at the FIS, would have constituted a routine border search and would have been allowed under the Constitution.

The border search exception has been extended to the "functional equivalent" of the border, which is defined as the first practical detention point after the border crossing or the initial port of entry.  See United States v. Beras, 183 F.3d 22 (1st Cir. 1999).  A three-point test has been developed to determine whether a search occurs at the functional equivalent of the border.  See United States v. Hill, 939 F.2d 1934 (11th Cir.

17

1991).  Under the three-point test, a basis for a functional equivalent of the border search exists if (1) there is reasonable certainty that the person or thing crossed the border; (2) there is reasonable certainty that there was no change in the object of the search (in this case the luggage) since it crossed the border; and (3) there is reasonable certainty that the search was conducted as soon as practicable after the border crossing.  Id. In this case, the "functional equivalent of the border" search exception would not be applicable because the search was not conducted as soon as practical after the border crossing.  Again, had the search been conducted at the time of the initial inspection at the FIS, the search would have met the criteria as an exception to the Fourth Amendment under both the border search exception and under the functional equivalent of the border exception.

There is, however, an additional doctrine under the border search exception known as the "extended border search doctrine." United States v. Cardenas, 9 F.3d 1139 (5th Cir. 1993); United States v. Yang, 286 F.3d 940 (7th Cir. 2002).  Under the extended border search doctrine, government officials may conduct a warrantless search beyond the border or its functional equivalent if the following three factors are satisfied:  (1) the officials have "reasonable certainty" of a high degree of probability that

18

a border has been crossed; (2) they have a "reasonable certainty" that no change in the object of the search has occurred between the time of the border crossing and the search; and (3) they have "reasonable suspicion" that criminal activity has occurred. Id. The first element of the extended border search doctrine is satisfied in this case. The second and third elements of the extended border search doctrine, however, are challenged. The determination of whether or not there is reasonable suspicion, under the third prong of the extended border search doctrine, turns on the totality of the particular circumstances. In that regard, an officer is entitled to assess the facts in light of his experience in detecting violations of the law. United States v. Melendez-Gonzales, 727 F.2d 407 (5th Cir. 1984).

    In the instant case, when examined in light of the totality of the circumstances, few of the typical indicators suggesting reasonable suspicion exist.[14] Virtually all of those indicators were known to customs officials at the time of the defendant's initial inspection at the FIS at approximately 4:00 p.m. on April 2, 2005. Specifically, the initial inspecting officers were aware that Ms. McGinnis was traveling with Mr. Ely; they

---

[14]See United States v. Yang, 286 F.3d 940, 948-49 (7th Cir. 2002) (travel from a known drug source nation, failure to respond to name when paged, attempting to hide or stay out of sight, lack of employment, inadequate luggage, etc.).

were aware that Mr. Ely had been determined to be carrying cash in excess of $10,000 and had failed to accurately report that fact on the required customs declaration form; and they were aware that Ms. McGinnis was a contract DOD employee traveling from Kuwait/Iraq and that contract DOD employees are highly compensated.  This information was, at that point in time, insufficient to arouse reasonable suspicion of criminal activity. Once Ms. McGinnis left the FIS and departed the secure/sterile area of the airport terminal with her luggage in her control, she became clothed with all the protections of any other citizen under the Fourth Amendment of the United States Constitution.

As previously noted, the Sixth Circuit has yet to examine the extended border doctrine but it has been adopted by several other circuits.  See United States v. Yang, 286 F.3d 940 (7th Cir. 2002); United States v. Espinoza-Seanez, 862 F.2d 526 (5th Cir. 1988); United States v. Caicedo-Guarnizo, 723 F.2d 1420 (9th Cir. 1984); United States v. Garcia, 672 F2d 1349 (11th Cir. 1982); United States v. Bilir, 592 F.2d 735 (4th Cir. 1979).  The doctrine provides that "non-routine border searches that occur near the border are deemed constitutionally permissible if reasonable under the Fourth Amendment."  Yang, 286 F.3d at 945. To determine whether an extended border search is reasonable, courts consider three factors:

> (1)  Is there reasonable certainty that a
> border crossing has occurred;
>
> (2)  Is there reasonable certainty that no
> change in condition of the luggage has
> occurred since the border crossing; and
>
> (3)  Is there a reasonable suspicion that
> criminal activity has occurred.

<u>Id</u>.

The Seventh Circuit's opinion in <u>Yang</u> is instructive because it involves the warrantless search of an individual's luggage following the arrest of his traveling companion by customs agents after the agents found opium-soaked clothing in the companion's luggage.  In <u>Yang</u>, Teng Yang ("Teng") and Lee Pao Yang ("Lee Pao") arrived at Chicago's O'Hare Airport on a flight from Laos carrying suitcases packed with clothes that had been soaked in an opium solution and then dried.  Teng passed through customs, retrieved his luggage, left the customs area, and walked to a different terminal within the airport less than a mile away, at which point he checked his suitcases on his connecting flight to St. Paul, Minnesota.  <u>Id</u>. at 943.  Lee Pao, however, was detained randomly at customs, at which point customs officials discovered the opium-soaked clothing in his bags.  Lee Pao was arrested, and upon questioning, admitted that he was traveling with another person.  The customs agents paged Teng, but he did not respond to the page.  The agents proceeded to search the terminal, found

Teng, and took him to identify the luggage he had just checked
onto his connecting flight.  After he identified his luggage, he
was returned to the customs office, and his bags were searched.
Id.


     In Yang, the court evaluated each of the three factors set
out above to determine whether the warrantless search of Teng's
luggage was reasonable.  As in this case, neither party disputed
that a border crossing occurred.  Id. at 947.  The next step in
the analysis is to determine whether there was a reasonable
certainty that no change in the condition of the luggage occurred
since the border crossing.  In Yang, the court noted that even
though the facts surrounding the location and condition of Teng's
bags once he left the customs area were not in dispute, a
totality of the circumstances analysis was necessary because "it
is this factor that establishes the proper nexus with the border
to allow a search[.]"  Id.


     The Yang court recognized that "[a]t some point a subject's
relationship with the border becomes so attenuated that customs
officials lose the right to detain him without a warrant."  Id.
at 948 (citing Caicedo-Guarnizo, 723 F.2d at 1423).  It found
that "that limit was not reached" in Teng's case because even
though he was not under surveillance for the "30 to 45 minute

22

period from the time when he crossed the border to the time when his luggage was searched[,]" he was in close proximity to the border and, most importantly, his luggage "was in the control of the airport personnel for a significant period of this time." Id.

In the instant case, however, the facts do not support a finding that the officers had reasonable certainty that "any contraband discovered in a search" of McGinnis' luggage was in her possession "at the time [she] crossed the border." Unlike Teng, McGinnis left the secured portion of the terminal, exited through airport security, and walked outside the terminal itself. She was not under surveillance during this approximately two hour period. Significantly, McGinnis' luggage was within her control during this entire period, as she did not check it onto another flight, like Teng.

The third factor in the extended border search inquiry is whether the customs inspectors had reasonable suspicion that McGinnis was engaged in criminal activity. See id. This factor is "analogous to a Terry stop." Id. at 949. In Yang, the Seventh Circuit held that reasonable suspicion existed because:

> Here, Teng evaded contact with the
> authorities at the terminal, they learned his
> itinerary from his traveling companion, and
> had discovered a significant amount of drugs
> on his companion.  Additionally, the officers
> knew that Laos was a source country for opium
> and that St. Paul was a common destination
> for opium in the midwest.

Id.  The court also found significant the fact that when the

customs inspector spotted Teng in the terminal, "the inspector

noticed Teng was 'kind of hunched over and trying to stay out of

sight.'"  Id. at 948 n.4.  In the instant case, however, all the

customs officers knew at the time that they decided to detain

McGinnis and search her baggage was that her traveling companion

was carrying more cash than he had previously declared.  Thus,

the substance being carried by her companion was not an illegal

controlled substance, she was not flying from a source country

for illegal substances, and she did not, in any way attempt to

evade contact with the authorities.  In fact, she readily

answered the page when asked to returned to the FIS to receive

the baggage of her traveling companion, Mr. Ely.


    The government has failed to establish the existence of both

the second and third components of the extended border search

doctrine at the time the decision was made to bring Ms. McGinnis

back to the FIS to search her luggage.  A significant portion of

24

the articulable facts the government relies on in this case appear to not have been known to Officer Polley and Special Agent Crum (the officers who decided to reinspect Ms. McGinnis' luggage) until after the reinspection was authorized.  Therefore, that information cannot have formed the basis for any reasonable suspicion of ongoing or imminent criminal activity.  See p. 14, 16 and notes 8, 9 and 10, supra.  The burden rests on the government to establish each component of its theory, by the greater weight or preponderance of the evidence in the context of the totality of the circumstances presented in the case.  United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990); United States v. Townsend, 138 F. Supp. 2d 968, 972-73 (S.D. Ohio 2000).


The government having failed in its burden to establish an exception to the warrant requirement under the Fourth Amendment of the United States Constitution, the defendant's motion to suppress must be GRANTED.


So ordered this 24th day of February, 2006.


                              s/ JON P. MCCALLA
                              UNITED STATES DISTRICT JUDGE